**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GARY HECK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 14 C 5491** |
| ) | |
| **SIMPLEXGRINNELL LP** ) | **Magistrate Judge Finnegan** |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM OPINION AND ORDER

Defendant SimplexGrinnell LP entered a contract to install fire protection equipment at a customer site, and subcontracted certain of the electrical work to Hartmann Electric Co. Plaintiff Gary Heck, a Hartmann electrician, sustained injuries when he fell over pipes while completing that work. He then brought this negligence action, alleging that Defendant is liable for the injuries.[1] Plaintiff asserts myriad theories of negligence, each premised on alleged failures of Defendant: failure to inspect, failure to provide a safe place to work, failure to properly maintain the room where the accident occurred, failure to provide prior warning of dangerous conditions, failure to provide "adequate safeguards" that might have prevented the injury, and failure to supervise his work. (Doc. 1-1, at 3-4). Each theory necessitates that Plaintiff first demonstrate that Defendant owed him a duty of reasonable care. Defendant has moved for summary judgment, asserting that, as a general contractor, it owed no duty of care to Plaintiff unless it retained control over his work, which it did not. Plaintiff disagrees, contending

---

[1]    Following removal of this diversity action from state court, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

that Defendant exercised sufficient control to create a duty. For reasons discussed below, the Court grants Defendant's motion for summary judgment.

## BACKGROUND[2]

Defendant is in the "fire protection business." (Doc. 46-1, at 9:11-13). In 2009, it entered a "Building Services Agreement" with customer Griffin Capital for service and ongoing inspection of its fire alarm system. (Doc. 46-5, at 37-49). Approximately two weeks before Plaintiff's accident in June 2012, Defendant entered into a "Services and Goods Order Agreement" (the "Services Agreement") with the customer for installation of a "low air trouble alarm" in the customer's "Fire Pump Room." (Doc. 46-6; Doc. 49 ¶ 8; Doc. 46-1, at 9:11-14). The project entailed coordination of three individuals: a sprinkler fitter, who would install a low-air pressure switch; an electrician, who would pull electric wire from the switch to a fire alarm panel; and finally, a fire alarm technician, who would connect and test the device. (Doc. 49 ¶¶ 20-22). Defendant employed sprinkler fitters and fire alarm technicians to complete those portions of the project itself, but it subcontracted the electrical work to Hartmann. (*Id.* ¶¶ 9, 19). No written agreement was executed by Defendant and Hartmann in relation to this work.

Plaintiff, who had completed similar projects on numerous occasions during his forty years as an electrician, spoke with Defendant's employee Nick Lieggi about the project. (*Id.* ¶ 5; Doc. 46-1, at 23:12-14, 36:18-24; Doc. 49 ¶¶ 5, 27). During a telephone call, Lieggi provided the address of the project to Plaintiff, and told him that

---

[2]     The facts are taken from Plaintiff's Response to Defendant's Separate Statement of Undisputed Facts (Doc. 45), Defendant's Response to Plaintiff's Statement of Additional Facts (Doc. 49), Plaintiff's deposition (Doc. 46-1), and exhibits submitted by the parties in support of their factual statements. Unless otherwise specified, page numbers for all record citations are drawn from the CM/ECF docket entries at the top of the filed document.

the job consisted of pulling a pair of wires from the low-air pressure switch to the fire alarm control panel, and also what tools and materials he would need. (Doc. 49 ¶¶ 27, 28; Doc. 46-1, at 37:1-12, 37:22-23, 38:11-39:14). Lieggi also told Plaintiff that the fire alarm technician would make connections and test the device on June 15, so Plaintiff believed that he needed to finish the electrical work on June 14. (Doc. 49 ¶ 29; Doc. 46-1, at 107:16-108:6).

When Plaintiff arrived at the site on June 14, 2012, he saw Defendant's sprinkler fitter, Mike Styx, who had just finished installing the switch. (Doc. 49 ¶ 31; Doc. 46-1, at 42:17-43:6). Styx told him that it was "tight" in the Fire Pump Room. (Doc. 46-1, at 106:13-20). Aside from this interaction, no one else spoke with Plaintiff before or during the course of his work, and Defendant provided him with no safety training or other instructions before he began. (Doc. 45 ¶¶ 19, 21; Doc. 46-1, at 55:22-56:11). Plaintiff brought his own tools and equipment, and before beginning, he surveyed the room and concluded that running wire from the switch to the fire alarm panel would entail his stepping over a fixed set of pipes. (Doc. 45 ¶¶ 11, 14, 15, 16; Doc. 46-1, at 47:2-9). The pipes were on a "pad" and were approximately twelve to twenty-four inches off the ground. (Doc. 46-1, at 45:5-24). Plaintiff believed that he could have benefitted from assistance of another electrician to feed the wire and thereby avoid stepping over the pipes, but he did not call Hartmann or Defendant to ask for help. (Doc. 46-1, at 41:8-17, 51:16-52:12, 108:7-18).

As Plaintiff ran the wire from the switch to the panel, he stepped over the pipes "[h]alf a dozen" times. (*Id.* at 48:13-23). After working for about two hours, he climbed over the pipes to free up wires, lost his balance, and fell. While falling, he injured his

right knee and left shoulder: he grabbed a jockey pump feed line to stop the fall, at which time he heard his left shoulder "pop," and when he released the line, he landed on his knee. (*Id.* at 49:3-50:15, 54:22-24, 50:15-17; Doc. 45 ¶ 10; Doc. 49 ¶¶ 2-3).

## DISCUSSION

A.    **Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "material fact" is a fact that would "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, if the evidence is merely colorable or there is not sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party, there is no issue for trial and summary judgment may be granted. *Id.* at 249-50. The party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). At the summary judgment stage, a court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In making this determination, courts "draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party[.]" *Continental Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) (quoting *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004)).

**B.      Analysis**

To state a claim for negligence, Plaintiff "must allege (and ultimately prove) that the defendant owed him a duty and breached that duty, and that [his] injury was proximately caused by the breach." *Kotecki v. Walsh Constr. Co.*, 333 Ill. App. 3d 583, 776 N.E. 2d 774, 777 (1st Dist. 2002). Turning to the duty issue, the general rule in Illinois is that one who employs an independent contractor owes no duty of care to that contractor. *Martens v. MCL Constr. Corp.*, 347 Ill. App. 3d 303, 807 N.E. 2d 480, 488 (1st Dist. 2004). The reason is that "a principal [such as a general contractor] generally does not supervise the details of an independent contractor's work and, thus, is not in a good position to prevent negligent performance, . . . ." *Id.* (citing *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 938 (7th Cir. 1986)). In contrast, an "employee submits to the employer's right to monitor and direct the details of the work in exchange for wages." *Id.*

**1.      Retained Control Exception under Section 414**

Section 414 of the Restatement (Second) Torts "carves an exception to this general rule where the general contractor . . . entrusts work to a subcontractor, exercises the requisite level of control over the work, and fails to exercise that control with reasonable care." *Henderson v. Bovis Lend Lease, Inc.*, 848 F. Supp. 2d 847, 850 (N.D. Ill. 2012) (citing *Aguirre v. Turner Constr. Co.*, 582 F.3d 808, 810 (7th Cir. 2009)); *see also Aguirre v. Turner Constr. Co.*, 501 F.3d 825, 829-30 (7th Cir. 2007) ("*Aguirre I*"). Section 414 states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable

> care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965).  The Supreme Court of Illinois recognizes Section 414 as a statement of Illinois law, and Illinois courts apply it regularly in negligence cases.  *Aguirre I*, 501 F.3d at 828 (citing *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 211 N.E. 2d 247 (1965) and discussing Illinois cases); *Martens*, 807 N.E.2d at 488-93 (also discussing Illinois cases applying Section 414).

Whether a duty of care exists based on retained control within the meaning of Section 414 is a question of law to be decided by the Court.  *Aguirre I*, 501 F.3d at 829; *Wilkerson v. Schwendener*, 379 Ill. App. 3d 491, 884 N.E. 2d 208, 211 (1st Dist. 2008); *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 719 N.E. 2d 174, 176 (1st Dist. 1999).  It is only when there are underlying factual disputes that bear on *whether* control was retained or the *amount* of control that was retained that a trial by jury is necessary so the Court can determine whether a duty existed.  *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 1051, 728 N.E. 2d 726, 732-33 (1st Dist. 2000) (citing *Weber v. N. Ill. Gas. Co.*, 10 Ill. App. 3d 625, 295 N.E. 2d 41, 51 (1st Dist. 1973)).

Comment *c* to Section 414 elucidates that, for the retained control exception to apply, the general contractor:

> must have retained at least some degree of control over the manner in which the work is done.  It is not enough that [the general contractor] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the [independent] contractor is controlled as to his methods of work, or as to operative detail.  There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

6

Restatement (Second) of Torts § 414, comment *c.* "In other words, the owner or general contractor must control not just the ends, but the means." *Stanley v. Ameren Ill. Co.*, 982 F. Supp. 2d 844, 853 (N.D. Ill. 2013) (citing *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916, 627 N.E. 2d 1265, 1270 (3d Dist. 1994) (explaining that a general contractor's retention of "the right to inspect the work done and order changes to the specifications and plans" and to "make sure safety precautions were observed, and that the work was done in a safe manner" does not show retention of "any control over the incidental aspects" of the subcontractor's work such that a duty arises)).

### 2. Contractual Language

In seeking summary judgment, Defendant focuses on the lack of evidence of actual control over Plaintiff's work, noting that it merely requested him to install electrical wire and did not instruct him on the details of the work, provide any tools, materials or training, control the premises, or observe his work. While Plaintiff disagrees, he also asks the Court to consider certain contractual language that he believes supports his position that Defendant retained sufficient control to create a duty of care. This Court agrees that contractual language must be considered. "To decipher whether an employer retained control over an independent contractor, courts look to the contracts that establish the relationship." *Id.* (citing *Joyce v. Mastri*, 371 Ill. App. 64, 861 N.E. 2d 1102, 1110 (1st Dist. 2007) ("The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists.")).

In this case, there are no contracts that govern the relationship between Defendant and its subcontractor Hartmann (who employed Plaintiff), or between

Defendant and Plaintiff himself. Accordingly, Plaintiff relies on language in the Services Agreement that Defendant entered with its customer, Griffin Capital, two weeks before the fire protection equipment was installed at Griffin Capital's premises. Since it is possible that this Services Agreement to which neither Hartmann nor Plaintiff was a party may nonetheless reflect Defendant's agreement to retain control over Plaintiff's work, the Court will examine its terms. *See Moss v. Rowe Constr. Co.*, 344 Ill. App. 3d 772, 801 N.E. 2d 612, 617 (4th Dist. 2003) (finding control over subcontractors in a contract between the project owner and the general contractor, even though the subcontractors were not parties to that contract).

Plaintiff urges that the Services Agreement demonstrates that Defendant retained control over Hartmann's work because under the agreement:

- Defendant was "responsible for all aspects of the job, namely design, engineering, maintenance, repair, construction, installation, or consulting or professional services;"

- Defendant "agreed to perform its duties with [the] highest level of professional skill, care and diligence;" and

- Defendant "scheduled the work all under the time constraints set forth in the [Services Agreement] that specifically stated time was of the essence."

(Doc. 47, at 8).

As a preliminary matter, Plaintiff's recapitulation of the Services Agreement's terms is not entirely accurate, so it is helpful to restate in their entirety the "Services" definition and the "Standard for Performance" provision. The agreement does not state, for example, that Defendant "was responsible for all aspects of the job." Rather, "Services" are simply defined as "any effort specifically required by this Order such as design, engineering, maintenance, repair, construction, installation, or consulting or

8

professional services." (Doc. 46-6, at 2). The agreement later sets forth the "Terms Applicable to the Performance of Services" and the first such term provides the following "Standard for Performance:"

> Seller [Defendant] agrees to perform the Services to the specification of Order in a first-class and workmanlike manner, and using the highest level of professional skill, care and diligence. Seller shall perform the Services to conformity with accepted standards of construction and safety, Owner's specifications and drawings, and the rules and regulations for the Project (the "Building Rules and Regulations") as may be promulgated by Owner from time to time. By execution of this Order, Seller acknowledges receipt of a copy of the [illegible] Rules.

(*Id.*). Although Plaintiff does not mention it, the agreement also required Defendant to "at all times . . . comply with all applicable federal, state, municipal, and local laws, orders, and regulations." (*Id.*). Notably, while the agreement expressly recognized that Hartmann would work on the project, it was silent as to how Defendant was to supervise and oversee subcontractors (if at all). (*Id.* at 2, 4).

Relying on *Moss*, 801 N.E. 2d 614-18, Plaintiff urges that the contractual provisions demonstrate that Defendant retained control and therefore owed him a duty of care. This Court disagrees. *Moss* was a negligence action against a general contractor for the death of a roadway construction worker, in which the general contractor had signed a contract with the Illinois Department of Transportation ("IDOT") that had several safety-related provisions. Specifically, the general contract required that the general contractor: (1) provide "all safeguards, safety devices[,] and protective equipment and take any other needed actions as it determines, or as the [State Highway Agency] contracting officer may determine to be reasonably necessary to protect the life and health of employees on the job . . . ;" (2) forbid "any employee, in

performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous[,] or dangerous to his/her health or safety . . . ;" and (3) furnish a superintendent who "has full authority to direct performance of the work in accordance with the contract requirements . . . ." *Id.* at 613. In light of these specific safety provisions, the court concluded that the general contractor had "contractually agreed to assume the duty to control the safety of the workers on the project in the contract between defendant and IDOT." *Id.* at 617.

In reaching this conclusion, the court contrasted the specificity of the contract's language with the more general contractual language in cases where courts found no retained control. *Id.* at 619-20. Two such cases were *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 794 N.E. 2d 937, 937-43 (1st Dist. 2003) and *Rangel v. Brookhaven Constructors, Inc.*, 719 N.E. 2d at 177. The *Moss* court characterized *Shaughnessy* as involving a "standard form agreement" that established only "a general right to stop, start, and inspect the progress of the work." *Moss*, 801 N.E. 2d at 619. So too in *Rangel*, the *Moss* court explained that there was no specific mandate for safety and only a general right because the contractual language stated: "[t]he General Contractor shall have the right to exercise complete supervision and control over the work to be done by the Subcontractor, but such supervision and control shall not in any way limit the obligations of the Subcontractor." 719 N.E. 2d at 177.

Plaintiff also relies on *Aguirre I*, 501 F.3d at 829, but there the Seventh Circuit found sufficient evidence of retained control because of extensive safety provisions in the contract. Finding "easily distinguishable" those cases where the general contractor had "promulgated no specific safety rules" or had "no oversight whatsoever over the

work the plaintiff performed for the subcontractor," the court pointed out that the general contractor had adopted twenty-three specific safety requirements. *Id.* at 830-31.

The contractual language in the case at hand, like the language in *Shaughnessy* and *Rangel,* at most can be read to reserve to Defendant a general right of control that in no way impacts how Plaintiff was to perform the electrical work. Plaintiff has not explained how the general language in the contract between Defendant and its customer translated into specific safety requirements with which he was obligated to comply, such that he was not free to do the work his own way. Instead, the terms upon which he relies are broad, general standards, expressing no precise or particular actions that he needed to take in relation to safety, and he points to no facts in the record that demonstrate that the provision was the basis for any such requirements. The contractual provisions do not, for example, require that Plaintiff perform the wiring work consistent with certain specified safety protocols, with the assistance of other electricians, or only in a manner dictated by Defendant. Absent are provisions regarding the use of particular safety equipment for passing over the pipes or other like measures that would have impacted the means or methods of his work.

Although it is difficult to read in harmony each of the Illinois cases on retained control under Section 414, what becomes clear is that even where contractual language has considerable specificity with regard to safety measures, the plaintiff still must demonstrate that the provisions impacted the means and methods of his work in order for a duty of care to be found. For example, in *Martens*, the court held that the contractual language, despite some safety-specific provisions, was generalized because it did not affect the plaintiff's means and methods of work and, therefore, did

not demonstrate the general contractor had retained control. 807 N.E.2d at 490-91. There, a steelworker who fell during the erection of condominiums argued that both the general contractor and a subcontractor were liable for failing to provide fall protection. *Id.* at 482. In finding an absence of retained control, the court looked to three contracts between (1) the project owner and general contractor, (2) the general contractor and a subcontractor, and (3) the subcontractor and a sub-subcontractor (which was the plaintiff's employer). *Id.* at 483.

The general contract stated that the general contractor was "responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract." *Id.* The general contractor was also "to give notices and comply with applicable laws, ordinances, rules and regulations bearing on the safety of persons or property or their protection from damage, injury or loss; erect and maintain, as required by existing conditions and performance of the contract, reasonable safeguards for safety and protection; and designate a member of [the general contractor] at the site whose duty was to prevent accidents." *Id.* In the subcontract, the subcontractor "warranted that it was familiar with and in compliance with all applicable laws, regulations and rulings, including Occupational Safety and Health Administration (OSHA) and workers' compensation" and "agreed to abide by [the general contractor's] directives, policies and procedures, including safety procedures." *Id.* This subcontract excluded as one of subcontractor's responsibilities the provision of OSHA safety cables. *Id.* Finally, the contract between the subcontractor and the plaintiff's employer obligated the employer to furnish the safety cables and also a copy of its safety manual to the general contractor. *Id.*

Notwithstanding the presence of these safety-related provisions, the court found no retained control by the general contractor and the subcontractor over the sub-subcontractor. It reasoned that the general contractor had reserved only a general right of control, and although the general contractor was obligated to initiate and supervise a safety program along with other safety-related obligations, these measures did not "equate . . . with control over the means and methods of [the plaintiff's employers'] steel erection work, particularly where [the employer] maintained contractual control of the supervision and safety of its ironworkers." *Id.* at 490. The court did not specifically analyze the subcontract, but its reliance on *Shaughnessy* for the proposition that "a general statement of control" did not mean an independent contractor "was controlled as to his methods of work or as to operative detail" suggests that, as with the general contract, the subcontract's terms simply were too general to demonstrate retained control over the sub-subcontractor's work. *See id.*

In an attempt to distinguish the case, Plaintiff points out that the *Martens* plaintiff failed to connect his fall to the general contractor's control (in other words, he did not prove causation), and notes that the plaintiff's employer had retained safety responsibilities for its employees. These distinctions make no difference. First, the court's inquiry into the contractual language focused only upon its terms. The court understandably did not consider facts related to causation when assessing whether the contractual language created a duty of care. *See id.* at 490-92.

Second, although the plaintiff's employer had assumed responsibility for the plaintiff's safety*,* that fact entered the court's analysis only to bolster its reading of the general contract as establishing merely a general right of control by the general

contractor.  *See id.* at 490.  Although Defendant's contract contains no provision that placed responsibility for safety with Hartmann, the language of the contract nevertheless remains highly general about safety measures.  In contrast, when the court in *Bokodi*, 728 N.E. 2d at 735, found retained control "despite defendants' statement in the agreement that the subcontractors were to be in control of their work," it did so because the subcontractor's agreement provided twenty-nine required safety measures and procedures that were indicia of operational control.  In the case at hand, even reading the silence of the contract to mean that Defendant (and not Plaintiff's employer) had control over safety, still absent are provisions like those in *Bokodi* that would impact the means and methods of Plaintiff's work.

Plaintiff also points to *Ryan v. Mobil Oil Corp.*, 157 Ill. App. 3d 1069, 510 N.E. 2d 1162 (1st Dist. 1987) for the proposition that a general contractor's duty is triggered under Section 414 if the contractor has the "power to forbid work from being done in a manner likely to be dangerous."  *Id.* at 1168 (quoting *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 237, 302 N.E. 2d 642, 648 (1st Dist. 1973)).  Neither *Ryan* nor *Pasko* is persuasive.  First, unlike the plaintiffs in those cases, Plaintiff points to no evidence that Defendant had the power to forbid his work from being done in a manner that it believed to be dangerous.  Second, the courts in *Ryan* and *Pasko* failed to heed the guidance of comment *c* of Section 414, which states (in part): "[i]t is not enough that [the general contractor] has merely a general right to order the work stopped . . . or to prescribe alterations or deviations."  For this reason, several courts have criticized the holdings in these cases.  *See Ross v. Dae Julie, Inc.*, 341 Ill. App. 3d 1065, 793 N.E. 2d 68, 74 (1st Dist. 2003) ("In light of *Ryan*'s cursory examination of comment *a* and failure

to consider comment *c*, we choose to follow the more recent line of cases, which incorporate comment *c* of section 414 into the duty analysis."); *Martens*, 807 N.E. 2d at 493 ("Like the *Ross* court, we choose to follow the more recent line of cases, which incorporate comment *c* of section 414 into the duty analysis."); *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App. (1st) 130771, at ¶ 85 (criticizing the court in *Pasko* for not drawing a "clear distinction between direct liability and vicarious liability" and noting that the case has been superseded "by our more recent decisions").

This Court finds from the Restatement and more recent Illinois cases that the general power to stop work from being done in a dangerous manner is insufficient to create a duty under Section 414. Instead, an absence of specific safety language is determinative as far as retained control on the basis of contract is concerned. Recently, language considerably more specific than the language upon which Plaintiff relies has been found *insufficient* to demonstrate retained control. *See Fonseca v. Clark Constr. Group, LLC*, 2014 IL App. (1st) 130308, at ¶¶ 6, 28-30 (no retained control where general contractor was "responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work, including safety of all persons and property during performance of the Work[,]" and was to "take all reasonable precautions and safety measures, including those listed in the Contract Documents . . . for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to . . . " persons performing the work, because these provisions did not demonstrate retained control over "the incidental aspects of the independent contractor's work.").

Lastly, Plaintiff argues that Defendant retained control because it "had an ongoing responsibility to report unsafe conditions in the Fire Pump Room per its own safety rules." In making this argument, Plaintiff relies on a requirement in a different contract: the Building Services Agreement that Defendant entered into with its customer in 2009, almost three years before the accident. (Doc. 46-5, at 37-49). Under this agreement, Defendant's employees would have been required to report to their superiors any "unsafe conditions" that they noticed in or near the Fire Pump Room while fulfilling Defendant's inspection and service obligations. (*See generally* Doc. 49 ¶¶ 34-38). Plaintiff notes that this was for the protection of everyone in the room.

Assuming Defendant owed a duty of care to Plaintiff, then certainly evidence of Defendant's knowledge of unsafe conditions in the Fire Pump Room and failure to report them as required under the Building Services Agreement with its customer would bear on whether its breached a duty. But this reporting requirement in the Building Services Agreement does not speak to the issue of whether Defendant retained control over the means and methods of Plaintiff's work and hence is irrelevant to the antecedent question of whether Defendant owed a duty.

## 2. Supervisory and Operational Control

The absence of specific safety requirements in the contract does not end the Court's inquiry. Even where the contract does not demonstrate retention of control, "Illinois courts ask whether the principal . . . actually engaged in detailed supervision and/or control of subcontractors' methods and means of performing work." *Aguirre I*, 501 F.3d at 830; *Cain v. Joe Contarino, Inc.*, 2014 IL App. (2d) 130482, at ¶ 86 ("a court can find retained control despite the contract language if the parties' course of conduct

demonstrates such control."); *Stanley*, 982 F. Supp. 2d at 853 ("[T]he contractual language is not dispositive if the facts show that in practice the employer nevertheless exercised control.") (citing *Bokodi*, 728 N.E.2d at 735, which explained that a duty existed "despite defendants' statement in the agreement that the subcontractors were to be in control of their work," because "defendants went to great lengths to control the safety standards at the work site").[3]

In determining whether a general contractor retained sufficient supervisory or operational control to create a duty of care, courts look for "a substantial level of involvement in the incidental activities at the work site," such as safety meetings, walkthroughs, and constant work-site monitoring. *See Bokodi*, 728 N.E.2d at 735. In this case, there is virtually no such evidence in the record. Plaintiff was not in Defendant's employ and was free of Defendant's direction and supervision while completing the work. He not only determined how to accomplish his work based on his

---

[3]     This Court need not decide whether a duty would exist where a contract provided for the exercise of sufficient control but the general contractor never exercised it. The Seventh Circuit has noted in this regard:

> The importance placed on retained control through contract language by the Moss court, rather than on indicia of control such as supervisory authority or the authority to stop work for safety violations, has been the subject of live debate among state appellate courts. *Compare* [*Shaughnessy*, 794 N.E.2d at 943-44] (analyzing actual indicia of control with less emphasis on contract language), *with* [*Moss*, 801 N.E.2d at 615] (relying exclusively on contract language and criticizing the *Shaughnessy* approach as making "contractual obligations for safety a meaningless nullity"), *with* [*Martens*, 807 N.E.2d at 490] (highlighting *Moss*' misconstruction of *Shaughnessy*, criticizing its reliance on contract language alone, and advocating a more balanced approach).

*Schreiber v. Idea Eng'g & Fabricating*, 117 F. App'x 467, 471-72 (7th Cir. 2004). At the time the Seventh Circuit made this statement, the "Moss court's emphasis on contract language alone appear[ed] to be the minority position in states interpreting section 414, with only Arizona following a similar path." *Id.* at 473 n.2 (citing *Lewis v. N.J. Riebe Enters., Inc.*, 170 Ariz. 384, 825 P.2d 5, 12 (1992)).

own judgment, skill, and experience, Plaintiff also at all times used his own tools and equipment and provided his own wires and materials. These facts point to an absence of retained control. *Gregory v. Beazer E.*, 384 Ill. App. 3d 178, 892 N.E. 2d 563, 573 (1st Dist. 2008) (concluding that "it is clear that [the general contractor] did not retain the degree of control necessary to impose liability . . ." because the general contractor did not employ, direct, or supervise the plaintiff or provide him tools, and the plaintiff did not look to the general contractor for direction or supervision).

Plaintiff does not dispute these facts, alleging only that Defendant's employee Nick Lieggi told him about the nature of the work—its location, that it involved running wire from the switch to the panel, and that it should be completed in one day's time— and that Plaintiff would need certain tools and materials. That Defendant's employee explained the nature of the project in this manner does not come close to retaining the degree of control needed to create a duty. Just as the court in *Connaghan v. Caplice* reasoned, "[a]lthough [D]efendant provided the . . . plan and specifications, [D]efendant did not direct [P]laintiff in the incidental aspects of [P]laintiff's work." 325 Ill. App. 3d 245, 757 N.E. 2d 971, 976 (2d Dist. 2001). Further persuasive in this regard is *Welch v. Millikin University*, where the court held that a schedule to a contract for building security that set forth hiring requirements and rates of pay (with which the subcontractor that employed the guards was obligated to comply) did not demonstrate retained control over the subcontractor. As the court explained, such matters merely reflected what one party "wanted" and the other "agreed it could perform . . . ." 2015 IL App. (4th) 141012-U, at ¶¶ 76-77. Likewise, most of the facts to which Plaintiff points in this case are

18

aspects of the job to which his employer apparently agreed – that is, what was the project, where, and its date of performance.

At bottom, the record establishes that Plaintiff received no training or instructions on how to complete the wiring, was not supervised on site by Defendant, and relied on his own experience to determine how to complete the wiring work. The only "directions" he received were about the basic details of the project and what tools and materials he needed. It cannot be said these statements satisfy the requirement of "control," and thus, the evidence is clear that Defendant did not retain supervisory or operational control over Plaintiff's work.

### 3. OSHA and Expert Testimony

After Defendant filed the pending motion for summary judgment, Plaintiff deposed Defendant's expert, Steven Zebich, a professional and structural engineer. Plaintiff then sought and was granted leave to file a supplemental opposition brief, relying on the expert's testimony in an effort to defeat summary judgment. In his expert report, Zebich opined that OSHA policy indicates that the primary responsibility for the safety of construction employees rests with an employee's employer (here, Hartmann), though OSHA will hold a general contractor responsible for violations that it could reasonably have been expected to prevent by reason of its supervisory capacity. He went on to state that OSHA recognizes several factors that affect what may be considered a reasonable standard of care for a general contractor at a work site, but the measures that a general contractor must take to satisfy its duty is less than what is required of an employer to protect its own employees. (Doc. 59 ¶¶ 3-5).

During the deposition, Plaintiff's counsel questioned Zebich about this opinion as follows:

> Q: In Opinion 7 toward the end, you state, "OSHA further recognizes that the extent of the measures of a general contractor must implement to satisfy its duty of reasonable care is less than what is required of an employer with respect to protecting its employees," correct? (Objection, calls for a legal conclusion.)
>
> A: Yes.
>
> Q: So in this case [Defendant] was a general contractor, correct?
>
> A: Yes.
>
> Q: And so in this case [Defendant] did have a duty as a general contractor to its employees, correct?
>
> A: Yes.
>
> Q: And do you agree that [Defendant] also had the duty of reasonable care to [Plaintiff]? (Same objection.)
>
> A: Yes.

(*Id.* ¶¶ 6-7). Based on this testimony, Plaintiff urges there is evidence that (1) "the standard of care required the defendant to abate the hazard in the [Fire Pump Room]," and (2) "the defendant owed the plaintiff a duty of reasonable care." (Doc. 60, at 4-5). Defendant responds that Zebich's testimony must be disregarded, since whether a duty existed is an ultimate question of law for the Court to decide, and in any event, Illinois law is clear that OSHA standards do not create a duty of care. (Doc. 61, at 1-4).

As a preliminary matter, it is irrelevant to the antecedent duty question whether the standard of care required Defendant to "abate the hazard." This testimony would instead bear on whether a breach occurred if Defendant had a duty of care. As for Zebich's "yes" answer to the question of whether Defendant owed a duty, this Court

agrees that it is inadmissible testimony on an ultimate issue of law reserved to the Court. *See Thompson v. Gordon*, 241 Ill. 2d 428, 948 N.E. 2d 39, 45 (2011) ("Whether a duty is owed presents a question of law for the court to decide."). As the Seventh Circuit has explained, district courts properly disregard an expert's testimony on "purely legal matters" like duty because "expert testimony as to legal conclusions . . . is inadmissible." *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); *see also Bela Seating Co. v. Poloron Prods., Inc.*, 297 F. Supp. 489, 506 (N.D. Ill. 1968) ("opinions as to legal conclusions from a[n] . . . expert are never binding upon the Court.").

Even were the Court to consider Zebich's testimony on the duty issue, it would give the testimony little weight and still find that Defendant owed no duty to Plaintiff under the circumstances. It appears that Zebich based his opinion solely on the existence of certain OSHA regulations. But as the court in *Recio v. GR-MHA Corp.* explained, OSHA regulations serve only as evidence that a defendant has breached its duty of care; independently, they do not create such a duty. 366 Ill. App. 3d 48, 851 N.E. 2d 106, 115-16 (1st Dist. 2006) (citing *Feldscher v. E & B, Inc.*, 95 Ill. 3d 360, 370 (1983) and *Ross*, 793 N.E. 3d at 75); *see also Lee,* 2014 IL App. (1st) 130771, at ¶ 77 (provision requiring compliance with OSHA regulations did "not create a duty of care.").

Plaintiff cites to a litany of cases where courts considered OSHA and analogous state regulations in negligence actions, but he overlooks that not one of the cases relied on the regulations to find that a duty existed. Instead, the cases explain that the factfinder may properly consider such regulations when determining what the duty of care entailed and whether it was breached. *Schultz v. N.E. Ill. Commuter R.R. Corp.*,

201 Ill. 2d 260, 775 N.E. 2d 985-86 (2002) (discussing OSHA standards as evidence of the standard of care); *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 706 N.E. 2d 990, 926 (1st Dist. 1998) ("the OHSA sections . . . were given to the jury to establish the standard of care . . . ."); *Bates v. Kenny/Precision Joint Venture*, No. 89 C 181, 1991 U.S. Dist. LEXIS 6665, at *15-16 (N.D. Ill. May 15, 1991) (OSHA regulations provide "some, but not conclusive, evidence of a standard of care."); *Clements v. Schless Constr. Co.*, 8 Ill. App. 3d 291, 290 N.E. 2d 21, 26 (2d Dist. 1972) (analogous state rules "serve a useful function in establishing the proper standard of care to be exercised by the Defendant."); *LePage v. Walsh Constr. Co.*, 126 Ill. App. 3d 1075, 468 N.E. 2d 509, 510 (3d Dist. 1984) (state rules could be "a basis for establishing a standard of care . . . ."). Thus, in sum, neither Zebich's testimony nor the OSHA regulations establish that Defendant owed a duty of care to Plaintiff under the retained control exception to a general contractor's limited liability to independent contractors. Absent such a duty, Plaintiff's negligence claims fail, and the Court need not reach the questions of whether Defendant breached a duty and whether that breach caused Plaintiff's damages.

## CONCLUSION

For the reasons stated above, as a matter of law, Defendant did not owe a duty of reasonable care to Plaintiff. Defendant's Motion for Summary Judgment (Doc. 35) is granted, and Judgment will be entered in favor of Defendant.

ENTER:

Dated: February 23, 2016

SHEILA FINNEGAN
United States Magistrate Judge